The NCK ORGANIZATION LTD. and
William E. Greene, Jr., Appellees,

v.

Walter W. BREGMAN, Appellant.

No. 1091, Docket 76–7075.

United States Court of Appeals,
Second Circuit.

Argued June 14, 1976.
Decided Sept. 7, 1976.

Gilbert H. Weil, New York City (Bruce R. Hafner, Weil, Guttman & Davis, New York City, on the brief), for appellant.

Leonard G. Bisco, Bisco, Winkler & Higgiston, New York City, for appellees.

Before SMITH, MANSFIELD and OAKES, Circuit Judges.

OAKES, Circuit Judge:

We are called upon once again, as we have been in several recent cases,[1] to review an order of disqualification of counsel for breach of Canons 4 and 9 of the Code of Professional Responsibility (Code).[2] This case presents yet another variation of the case posited when a lawyer is retained as

---

1. See International Electronics Corp. v. Flanzer, 527 F.2d 1288 (2d Cir. 1975); Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 518 F.2d 751 (2d Cir. 1975); Hull v. Celanese Corp., 513 F.2d 568 (2d Cir. 1975); Meyerhofer v. Empire Fire & Marine Ins. Co., 497 F.2d 1190 (2d Cir.), cert. denied, 419 U.S. 998, 95 S.Ct. 314 (1974); Emle Industries, Inc. v. Patentex, Inc., 478 F.2d 562 (2d Cir. 1973). Orders of disqualification were held appealable in Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 496 F.2d 800 (2d Cir. 1974) (en banc).

2. Canon 4 states the axiom that "[a] lawyer should preserve the confidences and secrets of a client." Canon 9 provides that "[a] lawyer should avoid even the appearance of professional impropriety." ABA Code of Professional Responsibility (1975). The Code is recognized by both federal and state courts in this circuit as prescribing appropriate guidelines for the professional conduct of the bar. Cinema 5, Ltd. v. Cinerama, Inc., 528 F.2d 1384, 1386 (2d Cir. 1976); Hull v. Celanese Corp., 513 F.2d 568, 571 n. 12 (2d Cir. 1975).

counsel in a suit against his former client. As in *Hull v. Celanese Corp.*, 513 F.2d 568 (2d Cir. 1975), the triangle of conflict here is somewhat novel: the question presented is whether a law firm may represent a corporate officer against his former corporate employer when the firm and the client have both consulted with the former corporate house counsel on subjects at issue in the suit and the latter's testimony may bear on those issues. We conclude that the public's interest in the preservation of confidentiality in the attorney-client relationship requires that the order of disqualification of the United States District Court for the Southern District of New York, Constance Baker Motley, *Judge*, be affirmed.

This action was brought by The NCK Organization, Ltd. (ORG) against Walter Bregman, former director and senior vice president of ORG and former president and director of ORG's wholly-owned subsidiary, Norman, Craig & Kummel, Inc. (NCK). In dispute is Bregman's right as third party beneficiary to exercise an August 31, 1972, option to purchase 5,000 shares of ORG stock from one William Greene, plaintiff here; Bregman also asserts that a June 17, 1970, contract entitles him to require ORG in turn to repurchase these shares from him at current book value. Bergman's Standard Stockholder's Agreements of 1967 and 1968 required him to hold ORG stock for three years before ORG would repurchase it at book value at the termination of his employment. On June 17, 1970, however, Bregman entered into a special contract with ORG's corporate predecessor requiring it immediately to repurchase *any* ORG shares owned by Bregman at current book value, regardless of length of time owned, in the event of his termination. A second agreement of August 31, 1972, between ORG and William Greene conferred upon certain ORG executives including Bregman an option to purchase 5,000 ORG Class B shares from Greene at $5.47 per share.

Bregman alleges that his 1970 agreement entitled him on his termination from ORG in October, 1973, and upon the exercise of his option to purchase shares from Greene, to require ORG's immediate repurchase of these shares at the then book value of approximately $12.75 per share (which would yield him a $36,000 profit plus interest). After Bregman demanded the exercise of his option, ORG and Greene brought this suit for a declaratory judgment that Greene was not obligated to such a sale, nor ORG to such a repurchase, and the action was consolidated with Bregman's pending claim against Greene for $45,000 damages for failure to perform after exercise of the option to purchase.

This motion to disqualify the firm of Weil, Lee & Bergin, now Weil, Guttman & Davis (the Weil firm), as Bregman's trial counsel was made in December, 1974, after ORG's counsel discovered that Donald Randall, formerly house counsel for NCK and ORG and vice president of the latter until July, 1973, had become Bregman's counsel and had conferred with Bregman and the Weil firm as to Bregman's contract rights against ORG. The motion was referred to Magistrate Raby, who recommended Randall's disqualification and reserved the issue of the Weil firm's disqualification for Judge Motley's decision pending her rulings on cross-motions for summary judgment. On the basis of the pleadings, affidavits and depositions of Bregman and Randall, Judge Motley denied both motions for summary judgment, which orders are not appealed. The Weil firm and Randall were both ordered disqualified for ethical considerations under Canons 4 and 9 of the Code, pursuant to *Hull v. Celanese Corp., supra*, and *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2d Cir. 1973).[3] Appellant Bregman appeals only the order of disqualification of his counsel of record, the Weil firm, although he contests the findings of impro-

---

**3.** The district court referred specifically to the language of Ethical Consideration (EC) 4–5 under Canon 4 which states in part:

Care should be exercised by a lawyer to prevent the disclosure of the confidences and secrets of one client to another, and no employment should be accepted that might require such disclosure.

priety of Randall's representation and consultation.

■ The district court's findings are made in the exercise of its duty to supervise members of its bar, and will be disturbed only upon a showing of abuse of discretion. *Hull v. Celanese Corp., supra* 513 F.2d at 571. As has been true in each case in this field of ethical judgments, turning as it does upon the precise activities of the lawyer · vis a vis adverse clients, a detailed consideration of the record is required.

Randall served as house counsel to ORG and NCK and their corporate predecessors from 1967 until his employment was terminated on July 15, 1973. On that date he immediately became personal counsel to appellant Bregman who remained with ORG and NCK only until October, 1973. Randall's description of his job was as typical house counsel, requiring "management supervision" of the legal aspects of every transaction of ORG, even when outside counsel were also involved. He had significant connection in a legal capacity with the very legal instruments here in litigation. He prepared the June 17, 1970, contract signed by Kaplan, a vice president of ORG, and Bregman, about to assume presidency of NCK. Randall was also present at the first executive group discussion of the Greene option agreement of August 31, 1972, edited its draft, brought the relevant documents to the board of directors for confirmation, and signed the option agreement in his capacity as a vice president of ORG. He also procured a draft indemnity agreement from Kaplan, the seller of ORG shares to Greene, for ORG's "protection" regarding New York stock transfer tax.

When Randall began to represent Bregman in July, 1973, he advised the latter as to his rights under the Greene option contract and the Stockholder's Agreements as amended by the 1970 contract. Bregman later retained the Weil firm regarding the termination of his job, and both Bregman and Randall agreed the Weil firm should handle any litigation of the Greene option matter because of its trial expertise. Ran-

dall drafted a letter for appellant to Norman, then president of ORG, in October, 1973, demanding ORG's purchase of shares held by Bregman at book value. Randall also accompanied Bregman to the Weil firm's office at least three times that fall to discuss appellant's rights against ORG, and advised both Weil and Bregman on the matter. Randall participated with Weil in drafting a letter from appellant to Greene, giving notice of exercise of the option in November, 1973. Although Randall did not continue to give advice to the Weil firm regarding the litigation after January 24, 1974, he did characterize his relationship with it as one of "cocounsel" up until that time.

Bregman inquired as to the propriety of Randall's representing him in July, 1973, but Randall assured him he had no qualms to the extent his counseling did not betray professional confidences. Weil knew that Randall had been house counsel to ORG but accepted Randall's assurance that there would be no impropriety since no confidences were involved to which Bregman was not already privy because of his former positions at ORG and as director and chief operation officer of NCK.

We think it crucial, as did Judge Motley, that one of ORG's claims, indeed its central claim, in this action is that Bregman is not entitled to repurchase of the option shares because his acceptance of the 1970 and 1972 contracts together constituted an improper appropriation of a corporate opportunity or breach of fiduciary duty. The success of this claim depends in part upon proof of ORG's corporate state of mind, as well as Bregman's, at the time of execution of the contracts. Thus it may well be that Randall will be called to testify as to the corporation's awareness in 1972 of the potential benefit being conferred upon Bregman, given his rights under the 1970 contract. Randall's knowledge of ORG's confidences regarding the contract rights in issue thus represents much more than information with an abstract potential for disclosure.[4]

---

4. Appellant emphasizes that his action against Greene was filed on January 17, 1974, while

ORG's action against appellant did not take effect until January 24, 1974, when the Weil

To the contrary, his information regarding ORG's knowledge and intent is material in which not only Bregman and the Weil firm must have been vitally interested, but of which ORG is entitled to the benefit, irrespective of any taint arising from employment of Randall by Bregman or disclosure to the Weil firm (outside the scope of ordinary discovery). The potential of unfair discovery and use of it through private consultation rather than through the normal modes of interrogatories, deposition and trial examination is critical in this case.[5]

Bregman raises essentially two arguments on appeal: one regards Randall's work for ORG and the other Randall's contacts with the Weil firm. Appellant contends that the district court erred in finding that Randall as house counsel worked on matters substantially related to the issues in the present action, and erred in viewing any such matters as confidential or secret in light of Bregman's own knowledge of them as Randall's corporate superior. It is also asserted that, whatever the propriety of Randall's acceptance of Bregman as a client, Randall's contact with the Weil firm was insufficient to demonstrate any actual impropriety on the firm's part; such impropriety, it is argued, can be proved only by explicit evidence of the firm's actual receipt of confidences possessed by Randall.

This court has consistently held that, for attorney disqualification to be appropriate, see note 1 supra, matters within the pending suit must be "substantially related" to the matters involved in the prior representation. Judge Weinfeld's decision in *T. C. Theatre Corp. v. Warner Bros. Pictures*, 113 F.Supp. 265, 268–69 (S.D.N.Y. 1953), is oft cited for this proposition. It is clear that Bregman's rights under both the 1970 contract and the 1972 Greene option contract are at issue in the pending suit, and that Randall, ORG's house counsel, participated in the formation of both contracts. Having done so, his testimony may well be relevant, if not critical, to the issue of Bregman's possible breach of fiduciary duty.[6] (In this respect it is significant, as Judge Motley pointed out, that Bregman's special contract entitling him to a corporate repurchase was in contradistinction to that of all other corporate executives who had to hold their stock for three years.)

Appellant argues that there is no "substantial relation" between Randall's work for ORG and the present suit because Randall's connection to the contracts was only peripheral and required no legal ad-

---

firm accepted service for Bregman, having refused it earlier on January 8, 1974. Presumably we are to infer that the Weil firm's conferences with Randall in November and December, 1973, thus occurred in ignorance of the fact that Randall was likely to be a witness in the ORG suit and was in a position to disclose ORG's confidences to Weil and Bregman. It is clear, however, that before ORG's suit was filed the Weil firm's consultations with Randall were made with the contemplated purpose of pursuing Bregman's rights against Greene *and* ORG. Although ultimately the decision was made to litigate first against Greene alone, Randall's views of appellant's rights against ORG were part and parcel of what was sought by the Weil firm and obtained from him. Indeed, the Weil firm made specific inquiries as to the potential for improper disclosure at the time of its consultations with Randall, and rejected its own doubts, apparently, on the basis that Randall believed no confidences of ORG's were *confidential against Bregman.*

5. Appellant disputes the district court's finding that there are triable issues of fact to which disclosure of confidences may be relevant, alleging that the outcome of the suit depends solely upon a construction of the contracts within the four corners of the documents. This question was resolved against appellant by the district court's denial of his motion for summary judgment.

6. Judge Motley pointed out that unresolved factual claims (as to which Randall's testimony may have bearing) include: (1) whether the corporation and its representatives were unaware of Bregman's special 1970 contract when the Greene contract was being negotiated (and we would add whether Randall's knowledge thereof could be imputed to the corporation); (2) whether Bregman was aware of corporate ignorance or of the existence of the Greene option negotiations before their consummation; and (3) whether any failure of Bregman (or we would add Randall) to disclose Bregman's special contract affected ORG's decision to enter into the Greene option contract.

vice. Appellant bases this contention on Randall's deposition testimony that his preparation of the 1970 draft was made from express written instructions given by Kaplan and Bregman, and his editing of the 1972 contract was done merely for its "aesthetic" improvement. This characterization of his role as peripheral and nonlegal—in essence as "errand boy"—has to be measured, however, in the light of Randall's own characterization of his draft of at least one paragraph of the 1970 contract as involving "legal advice," and his attempt to procure an indemnity agreement for ORG's protection relating to the 1972 stock option agreement. More importantly, we cannot perceive a real distinction, in terms of the "substantial relation" test, between legal work and non-legal work, or between a requisite minimum of legal advice and mere peripheral legal participation.[7] As the court observed in *Cord v. Smith*, 338 F.2d 516, 524 (9th Cir. 1964):

> It does not make any difference that the particular transaction is one which could have been handled on the client's behalf by a layman. . . . Lawyers customarily render both legal and nonlegal services, without distinction. . . [C]lients . . . are entitled to expect that their lawyers will act as they are supposed to act, without quibble as to what particular services may have been technically legal services.

■ Although official house counsel here occupied the positions of ORG vice president and director, at least where circumstances indicate that his participation consisted of more than action simply in an officer's capacity, house counsel may not avoid the canons by claim of officerial action only.

■ Appellant's alternative argument that no "confidential" disclosures were involved in Randall's work on the two contracts on behalf of ORG overlooks the essential nature of information which is confidential between attorney and client, and the critical issues set forth in note 6 *supra*. The confidential nature of the information to which Randall had access in his fiduciary capacity as house counsel is not dependent upon whether it was secret from or known to Bregman as a corporate officer and director. As the court, strictly to be sure, explained in *Emle Industries, Inc. v. Patentex, Inc., supra*, 478 F.2d at 572–73, quoting from H. Drinker, Legal Ethics 135 (1953):

> [T]he client's privilege in confidential information disclosed to his attorney "is not nullified by the fact that the circumstances to be disclosed are part of a public record, or that there are other available sources for such information, or by the fact that the lawyer received the same information from other sources."

The Code itself in Ethical Consideration (EC) 4–4 notes that

> [t]he attorney-client privilege is more limited than the ethical obligation of a lawyer to guard the confidences and secrets of his client. This ethical precept, unlike the evidentiary privilege, exists without regard to the nature or source of information or the fact that others share the knowledge. . . .

Even if, as Randall asserted, all confidential information to which he as house counsel had access was independently known to Bregman from his own employment or from another source, ORG's privilege in this information as disclosed to its attorney Randall is not thereby nullified.[8]

---

7. Legal work by an associate for one of a large firm's many clients may not disqualify the associate from later representation of an adverse interest, if the matters worked on for the original client are not "substantially related" to the matters in the later action and thus are not presumed to have given the associate access to relevant corporate confidences. *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751, 756 (2d Cir. 1975).

8. It is important to remember that Bregman will have the right to pursue his defense in this action with new trial counsel and to disclose to them information to which he was privy as ORG's employee. *Hull v. Celanese Corp.*, 513 F.2d 568, 572 (2d Cir. 1975). That this is so further highlights the principle that the confidential nature of corporate "confidences" to which Randall had access is based upon the existence of an attorney-client relationship and not upon the content of the information itself.

Appellant's ultimate argument is that the *Hull* case requires that actual possession of ORG's confidences by Randall and actual disclosure of confidences by Randall to the Weil firm must be proven before disqualification of the Weil firm is appropriate. It is true that the Weil firm never worked for ORG or had direct access to its confidences. It cannot be asserted, however, that since no specific transfer of confidences from Randall to the Weil firm was shown to have occurred during their conferences, phone conversations, or letter-drafting, the Weil firm cannot have been tainted by improper receipt of privileged information. The appellant's reading of *Hull* is quite inaccurate: his argument as to the necessity of actual possession and actual receipt of confidences was made in *Hull* and characterized there as a "technical" one which overlooked "the spirit of Canon 9 as interpreted by this court in *Emle.*" *Hull v. Celanese Corp., supra,* 513 F.2d at 571–72. *See* Judd, *Conflicts of Interest—A Trial Judge's Notes,* 44 Fordham L.Rev. 1097, 1108–10 (1976). As we stated in *Hull, id.* at 572, quoting from *Emle,* the court need not "inquire whether the lawyer did, *in fact,* receive confidential information . . ." 478 F.2d at 571 (emphasis original). It may be presumed that Randall possessed confidences of his client ORG, and the possibility that breach of these confidences was committed by Randall is sufficient to make disqualification a necessary and desirable remedy "to enforce the lawyer's duty of absolute fidelity and to guard against the danger of inadvertent use of confidential information." *Ceramco, Inc. v. Lee Pharmaceuticals,* 510 F.2d 268, 271 (2d Cir. 1975). A presumption of potentially improper disclosure was accepted by the court in *Hull, supra,* where Randall's counterpart, attorney Delulio, became the client rather than the advising cocounsel of a firm theretofore untainted by conflict. Where it can reasonably be said that in the course of the former representation "the attorney *might* have acquired information related to the subject of his subsequent representation," *T. C. Theatre Corp. v. Warner Bros. Pictures, supra,* 113 F.Supp. at 269 (emphasis supplied), it is "the court's duty to order the attorney disqualified." *Emle Industries, Inc. v. Patentex, Inc., supra,* 478 F.2d at 571; *Hull v. Celanese Corp., supra,* 513 F.2d at 572. In *Hull* the disqualification of an "unrelated" law firm was affirmed where the district court found that there was "some evidence" of the "possibility" that the tainted lawyer-client "consciously or unconsciously" transmitted some confidence to the theretofore untainted firm. *Id.* at 570. It is true that in *Hull* there was a potential for continuing disclosure, which may not, we assume, exist here since Randall has by his own testimony provided no advice in the suit for some time and has not been retained to do so in the future. Nevertheless, where some evidence exists of the possibility that disclosures were made in the past of which the Weil firm cannot dispossess itself, the same policies which required disqualification in *Hull* require it here.[9]

The burden which appellant would place on ORG—to demonstrate that Randall possessed explicit confidences which were expressly received by the Weil firm—is no different from the burden, rejected by the court in *Hull,* that a former client prove the possession of confidences by its counsel-turned-adversary and prove her conveyance

---

**9.** Our decision here is not inconsistent, as appellant would believe, with *American Can Co. v. Citrus Feed Co.,* 436 F.2d 1125, 1129 (5th Cir. 1971), or *Cord v. Smith,* 338 F.2d 516 (9th Cir. 1964). *American Can* involved solely the conditions under which disclosure of confidences may be imputed from one law firm to another, holding that once the knowledge of one attorney in one matter is imputed to all members of his firm, that knowledge cannot be "re-imputed" from a different member of his firm to yet another firm simply on the basis that this second firm is "cocounsel" on a different matter. Although appellant relies on *Cord v. Smith* for the proposition that one attorney may regularly serve free from taint even though his cocounsel be disqualified, the court there in fact held that if an attorney were disqualified, "he should not be permitted" to act as an attorney "by way of consultation and advice outside the court." *Id.* at 521. The evidence before Judge Motley indicated that this is precisely what Randall did, albeit prior to his disqualification, by consulting with and advising the Weil firm on behalf of his client Bregman.

of them to her attorneys. The reasons for this rejection are forceful. Even if proof of receipt of confidential information is available to a former client, "he may not be able to use it for fear of disclosure of the very confidences he wishes to be protected." Note, *Attorney's Conflict of Interests: Representation of Interest Adverse to That of a Former Client*, 55 B.U.L.Rev. 61, 76 (1975). *See* Judd, *supra*, 46 Fordham L.Rev. at 1108 n. 4. To the former client's own unwillingness that the adversaries know the former attorney's information may be added its former attorney's unwillingness to disclose what portions of that information he has revealed to his new client: in this case Randall invoked the attorney-client privilege regarding his advice to Bregman until it became clear Bregman had waived it by his deposition testimony on the subject. For Judge Motley to have inquired further into the nature of Randall's information as house counsel, possibly vital to ORG, and his disclosures to Bregman and the Weil firm would have undermined the very purpose of protecting the confidentiality of the fiduciary attorney-client relationship.

The interests to be weighed against Bregman's interest in representation by counsel of his choice include others beyond that of preventing the unfair use of ORG's confidences by Bregman's attorneys in this action. As Judge Weinfeld reflected in *T. C. Theatre Corp. v. Warner Bros. Pictures, supra,* 113 F.Supp. at 269, an important purpose of the preservation of client confidences is "to encourage clients fully and freely to make known to their attorneys all facts pertinent to their cause." This observation is echoed in EC 4–1 of the Code:

> A client must feel free to discuss whatever he wishes with his lawyer and a lawyer must be equally free to obtain information beyond that volunteered by his client. A lawyer should be fully informed of all the facts of the matter he is handling in order for his client to obtain the full advantage of our legal system.

> . . .

Requiring attorneys to abstain from representation involving potential disclosure of former clients' confidences also frees lawyers from the difficult task of erecting Chinese walls in their own minds between what is confidential and what is not, and forwards "the public's interest in maintaining the highest standards of professional conduct and the scrupulous administration of justice." *Hull v. Celanese Corp., supra,* 513 F.2d at 569. In the circumstances of this rather unique case appellant's interest must yield in the balance and doubts be resolved in favor of disqualification for the adequate protection of these other interests under Canons 4 and 9 of the Code.

Judgment affirmed.

MANSFIELD, Circuit Judge (concurring):

I concur in the result but on a somewhat more limited basis than that indicated in Judge Oakes' characteristically thorough and thoughtful opinion.

I agree that Randall's representation of appellant Bregman was plainly improper. It is beyond dispute that the matters about which he was consulted by Bregman were substantially related to those concerning which he had represented his former clients, ORG and NCK, as their house counsel. Under established precedent in this circuit, it must be presumed that in the course of these representations confidences were imparted to Randall by his clients, which automatically precluded his later representation of Bregman with respect to substantially the same subject matter. *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 570 (2d Cir. 1973); *Consolidated Theatres v. Warner Brothers,* 216 F.2d 920 (2d Cir. 1953); *T. C. Theatre Corp. v. Warner Bros. Pictures,* 113 F.Supp. 265 (S.D.N.Y.1953).

Disqualification of the Weil firm, however, must stand on a different footing since it never had an attorney-client relationship with ORG or NCK and hence cannot be presumed to have come into confidential information from them as their attorney. The question is whether a new counsel is to be automatically disqualified from representing Bregman because the

new counsel talked with a disqualified lawyer (Randall).

In *Hull v. Celanese Corp.*, 513 F.2d 568 (2d Cir. 1975), we held that a law firm seeking to represent a lawyer in a suit against the latter's former client was disqualified, apparently on the theory that it could be presumed that, *as a client*, the lawyer-client would impart to her counsel information received in confidence from her former client.[1] The *Hull* decision may be explained on the basis of the egregious circumstances of that case and the strong likelihood that, despite conscientious efforts on the part of the law firm to avoid transferral of confidential information, some confidence would be disclosed by its client, who had worked as attorney for Celanese on the very lawsuit against it in which she now sought to intervene as a party. In short, the appearance was plainly a bad one. As we there stated, however,

> "The scope of this opinion must, of necessity, be confined to the facts presented and not read as a broad-brush approach to disqualifications." 513 F.2d 572.

I believe that the same caveat should issue in the present case. I concur in the result only because it is undisputed that Randall, who was clearly disqualified, had engaged in fairly extensive discussion of the case with the Weil firm, giving advice to that firm and to Bregman. Under the circumstances, I cannot say that it was an abuse of discretion for Judge Motley to have exercised the district court's supervisory power to disqualify the Weil firm. However, I would not subscribe to an ironclad rule automatically presuming that a disqualified lawyer has disclosed confidences to a firm which was not in an attorney-client relationship with the other side. While an automatic taint may be a salutary method of enforcing ethical principles against an attorney who personally acted in a fiduciary capacity for an adversary, it smacks of an overkill to extend such a taint

to a new counsel brought in by him to represent someone else. Whether the disqualification is to be extended to the new firm should turn on the circumstances surrounding his consultation of that firm and particularly the nature and extent of the communications between the disqualified lawyer and the new firm. If, for example, the disqualified lawyer's sole connection with the new firm were, because of his own disqualification, to act as an intermediary in asking it to represent the client, the appearance of the situation would not in my view require an extension of the taint.

---

1. Although the opinion states that it "should not be read to imply that . . . Delulio [the client and former attorney for Celanese] cannot pursue her claim" against Celanese, 513 F.2d at 572, it is difficult to understand how Delulio could accomplish this when, as the decision holds, both she and any counsel representing her would be automatically disqualified.